UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE ESTATE OF                    )
RALPH R. SMITH III;              )
AND DR. DEBORAH MCCOY,           )
                                 )
            Plaintiffs,          )   CIVIL ACTION NO.
                                 )   1:19-CV-10328-DPW
v.                               )
                                 )
RAYTHEON COMPANY, JOHN DOE,      )
IN ITS CAPACITY AS PLAN          )
ADMINISTRATOR, RAYTHEON COMPANY  )
PENSION PLAN FOR SALARIED        )
EMPLOYEES OR ITS DESIGNATED      )
SUCCESSOR, and RAYTHEON BENEFIT  )
APPEALS COMMITTEE,               )
                                 )
            Defendants.          )

MEMORANDUM AND ORDER
November 30, 2021

At issue in this case is the availability of annuity benefits from an ERISA plan.  The Plan has taken the position that the participant, Ralph E. Smith, III, did not perfect his non-standard election of those benefits to its satisfaction before he passed away.

Plaintiffs — the Ralph E. Smith III Estate, and Mr. Smith's widow, Dr. Deborah McCoy — contend that attempts to make the non-standard election were improperly frustrated by action and inaction of the several defendants (collectively "Raytheon"). They seek relief in the form of benefits under the Plan that Mr. Smith attempted — but formally failed — to select before he lost his battle with amyotrophic lateral sclerosis ("ALS").

There is no dispute that Dr. McCoy is the rightful beneficiary under her late husband's plan.  The question presented by the case is whether she should receive the benefits from the standard annuity or those of the annuity that Mr. Smith plainly intended and attempted to select.

Upon Raytheon's motion to dismiss, I review Plaintiffs' Complaint to determine whether they adequately plead a claim for relief.

## I. GENERAL BACKGROUND

### A.   *The Parties*

**Plaintiffs Dr. Deborah McCoy** and **the Estate of Mr. Smith** brought this action (a) to recover what they view to be the remainder of the benefits to which they are entitled following Mr. Smith's death and (b) to prevent any further denial of their future right to such benefits.  Dr. McCoy was married to Mr. Smith at "all relevant times."

**Defendants** consist of the **Raytheon Company**, which is headquartered in Waltham, Massachusetts and sponsored the benefit plan at issue; a currently unknown **Plan Administrator** ("John Doe");[1] the **Raytheon Company Pension Plan for Salaried Employees,** (the "Plan"); and the **Raytheon Benefit Appeals**

---

[1] Plaintiffs indicate that they will amend the Complaint to identify definitively by name the Plan Administrator after they receive the relevant information in discovery.

**Committee**, which is organized under the Plan.

## B.   *The Factual Allegations*

Mr. Smith was a long-term employee of Raytheon Company, where he worked for thirty-six years.  He was diagnosed with ALS in July 2016.

Following that diagnosis, Mr. Smith and Dr. McCoy executed a Durable Power of Attorney, which became effective on September 2, 2016.  Included in the powers granted to Dr. McCoy as her husband's "attorney in fact" was the "full power and authority with regard to all 'Retirement Plans,'" which included the "Plan" at issue here.[2]  Additionally, the authority granted to Dr. McCoy under the Power of Attorney included, but was not limited to, the power "to elect a form of payment of benefits" under the Plan and to "make [and] exercise . . . all elections and/or options that [Mr. Smith] may have regarding" the Plan.

Just over a year later, in October 2017, Mr. Smith and Dr. McCoy began planning for his retirement in light of his

---

[2] The Plan at issue here is set out in two documents submitted by Raytheon in support of its Motion to Dismiss.  The first document is the general "Raytheon Company Pension Plan for Salaried Employees" entered as Dkt. No. 14-1.  The second document contains the particular elements of the general plan for salaried employees, such as Mr. Smith, who were participants in the salaried employment plan on January 1, 2001.  This second document was entered as Exhibit A within Dkt. No. 14-2.  The refinements provided by the second document to the basic salaried employment plan are identified by the suffix "-A" to each Article of the Plan, e.g. "Article 1-A."

deteriorating health.  Mr. Smith decided to retire on October 6, 2017; however, there is no indication in the Complaint that his intention to terminate his employment was formally communicated to Raytheon.

On October 9, 2017, Dr. McCoy called the Raytheon Benefits Center to discuss her husband's options and assist with realizing his intention to retire.  The Benefits Center required Mr. Smith's verbal confirmation that they had permission to speak with Dr. McCoy on his behalf.  He provided that confirmation.  After reviewing the package of annuity options, Mr. Smith determined that he wanted to select the 100% Joint and Survivor Annuity.

With this direction, Dr. McCoy called the Benefits Center on October 23, 2017 to execute her husband's choice.  The Benefits Center requested verbal consent again from Mr. Smith for Dr. McCoy to speak on his behalf.  However, at this point, Mr. Smith was unable to speak because he was on constant external ventilation due to the progression of his ALS and end stage respiratory failure.  As a result, the Benefits Center refused to speak with Dr. McCoy about Mr. Smith's choice.

In an attempt to facilitate conversations on Mr. Smith's behalf, Dr. McCoy faxed the Power of Attorney to the Benefits Center on October 24, 2017.  The Benefits Center received Mr. Smith's Power of Attorney that day.  The following day, October

25, 2017, after being informed by the Benefits Center that the processing time for the Power of Attorney would be four or five days, Dr. McCoy informed the Benefits Center that Mr. Smith was unlikely to survive that long.  She explained to the Benefits Center that failing to process the Power of Attorney before his death could result in his inability to make his desired election.

The same day, either on the same call or on a different call with the Benefits Center, Dr. McCoy was advised that Mr. Smith could make his retirement elections by phone; however, this was never effectuated because the Benefits Center declined to accept elections from Dr. McCoy, despite its prior receipt of the Power of Attorney, when Mr. Smith was no longer able physically to speak for himself.

Mr. Smith passed away on October 27, 2017.  Raytheon finally confirmed the processing and approval of the Power of Attorney more than two weeks thereafter, on November 14, 2017.

Plaintiffs contend that the reason that they acted in the manner they did to try to elect Mr. Smith's benefits was because they were advised to do so by Raytheon and then relied upon its advice.  Plaintiffs also contend that Raytheon's failure to act pursuant to the duly executed Power of Attorney rendered timely, non-standard elections impossible under the circumstances.

As a result of Mr. Smith's death before he had formally elected his preferred annuity benefits, Dr. McCoy received the default benefit, a 50% Surviving Spouse Benefit.  The monthly payment associated with the 50% Surviving Spouse Benefit is equal to the monthly payment for the 50% Joint and Survivor Annuity,[3] which is the default benefit for a plan participant who retires before his death.[4]  In order to receive any non-standard annuity, such as the 100% Joint and Survivor Annuity,[5] the participant must make a special election in writing, pursuant to Article 9.2-A of the Plan.[6]

---

[3] It appears the payments to surviving spouses under the default benefit are equivalent to those of the Plan Participant, even if the Plan participant dies before formal retirement.

[4] The standard benefit is designed to address these circumstances and is termed the 50% Joint and Survivor Annuity when a married participant retires and begins to receive a pension.  As such, it provides an annuity for the life of participant in a monthly amount determined under the Plan provisions and, following the participant's death, a monthly survivor annuity for the life of his/her surviving spouse that is 50% of the amount that had been payable to the participant.  Alternatively, when a married participant dies before the pension payments commence — presumably including the period between election and formal retirement — the surviving spouse receives what is termed a monthly 50% Surviving Spouse Benefit.  This benefit is equal to the survivor annuity that would have been paid if the participant had retired, had begun receiving a 50% Joint and Survivor Annuity, and had died after benefit commencement.

[5] The 100% Joint and Survivor Annuity would provide the participant with a reduced monthly amount while he or she was still alive, and a payment of that same amount to continue to be paid to the surviving spouse for the remainder of his or her life, thereafter.

[6] In its motion to dismiss, Raytheon asserts that a participant must "retire" before making any non-standard retirement elections.  According to the definition in the Raytheon Company

Dr. McCoy filed her written claim for the 100% Joint and Survivor Annuity on December 26, 2017, and it was denied on January 18, 2018.

Dr. McCoy filed an internal appeal on January 26, 2017. After reviewing her appeal on February 21, 2018, Raytheon, again, denied Dr. McCoy's claim on March 7, 2018.

Through this litigation, Dr. McCoy seeks to recover the full value of the 100% Surviving Spouse Benefit that Mr. Smith selected for her before his death.[7]  There appears to be no

---

Pension Plan for Salaried Employees, a person "[r]etires" when he "terminates employment" with Raytheon.  Mr. Smith died without previously terminating his employment, although he apparently intended to do so.  However, I do not find language in the Plan document to the effect that retirement as such is a condition precedent for election of a non-standard benefit. Indeed, Article 8.5-A of the Plan states that even if a participant elects a non-standard benefit outside the 180-day period ending on the Annuity Starting Date, that election will be honored under the Plan.  Article 8.5-A(a) thus contemplates a scenario in which the participant has made a non-standard election before formally retiring.  Dkt. No. 14-2 Exh. A at 36.

[7] In their motion to dismiss, the Defendants suggest that this benefit should be referred to as the 100% Surviving Spouse Benefit, rather than the 100% Joint and Survivor Annuity, because the Joint and Survivor Annuity provides pay-out to participants who retire and begin to receive payments before their death, while the Surviving Spouse Benefit pay-outs are paid to surviving spouse beneficiaries, such as Dr. McCoy.  For purposes of this Memorandum, because there is no information in the record provided to indicate otherwise, I assume that the amount that would be paid to Dr. McCoy under the 100% Joint and Survivor Annuity for which she filed and the 100% Surviving Spouse Benefit that Raytheon claims is proper under the circumstances are equivalent.  Accordingly, the 100% plan will be referred to in this Memorandum as the 100% Surviving Spouse Benefit.  If the amount payable to a surviving spouse under the 100% Joint and Survivor Annuity is different from the 100%

dispute that Mr. Smith met the requirements for Surviving Spouse Benefit eligibility, outlined in Article 8.4-A, apart from the formalities of election.

### C.  *Relevant Fiduciary Responsibility Under the Plan*

Fiduciary responsibilities are allocated under the Plan by Article 8.11(a) as follows:

(1) The sole power and discretion to manage and control the Plan's assets . . . is allocated to the Trustee,[8] except to the extent that the Investment Committee or Coordinating Investment Fiduciary exercises, or appoints another fiduciary to exercise, the power to control or manage . . . all or any part of the assets of the Plan.

(2) The sole duties, responsibilities and powers allocated to the Participating Employers and to the boards of directors of the Participating Employers shall be those expressed in the Plan or the Trust Agreement.

(3) All fiduciary responsibilities not allocated to the Trustee, the Investment Committee, the Coordinating Investment Fiduciary, the board of directors of Raytheon or any Participating Employer or any investment manager or other person or persons granted investment powers are hereby allocated to the Administrator,[9] subject to delegation in accordance with Section [Article] 7.1(e).[10]

---

Surviving Spouse Benefit, the parties must advise the Court promptly, providing a full explanation with relevant record citations regarding that difference.

[8] The Trustee is the Boston Safe Deposit and Trust Company. Article 1.48.

[9] The "Administrative Duties and Powers of the Administrator" are set forth in Article 7.1 which provides that the Administrator "shall be the named fiduciary for purposes of ERISA."

[10] Article 7.1(e) provides that the Administrator has the power and authority "to delegate any power or duty to any other person or persons . . . ." The text of the Articles which constitute the Plan appear to use the term "Section" when referring to subdivisions within the Articles.

## D.    *Travel of the Dispute*

Following their unsuccessful 2018 internal appeal with Raytheon, on February 20, 2019 Plaintiffs filed the Complaint before me in this court against Raytheon Company, an unknown plan administrator (identified at this point as John Doe, *see supra* note 1), the Raytheon Company Pension Plan for Salaried Employees, [the Plan] and Raytheon Benefit Appeals Committee, [together, "Raytheon"] pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

In three separate counts,[11] Dr. McCoy and her deceased husband's estate seek relief in the form of recovery of the full value of the 100% Surviving Spouse Benefit annuity under the Plan in which Mr. Smith participated while employed at Raytheon and of a corresponding injunctive relief to prevent Raytheon's denial of their right to these benefits.  Raytheon has moved to dismiss all counts.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires that a complaint include a "short and plain statement of the claim

---

[11] All three counts of the Complaint seek the same relief under different provisions of ERISA:
Count I: Claim for Denial of Benefits, to Enforce Rights and Clarify Rights under ERISA § 502(a)(1)(B);
Count II: Claim for Breach of Fiduciary Duty under ERISA §§§ 404, 409 and 502(a)(2); and
Count III: Claim for Equitable Relief pursuant to ERISA § 502(a)(3).

showing that the pleader is entitled to relief." FED. R. CIV.
P. 8(a).  The short and plain statement need only "give the
defendant fair notice of what the . . . claim is and the grounds
upon which it rests." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S.
544, 555 (2007) (internal quotation omitted).  "To survive a
motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to state a claim to relief that is
plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678
(2009) (citing *Twombly*, 550 U.S. at 570).  At the motion to
dismiss stage, a court must draw all reasonable inferences in
favor of the non-moving party. *See Gargano* v. *Liberty Int'l
Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009).

It is well settled that "[a] claim has facial plausibility
when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged" and that the misconduct is
actionable. *Iqbal*, 556 U.S. at 678; *see also Lemelson* v. *U.S.
Bank Nat. Ass'n*, 721 F.3d 18, 21 (1st Cir. 2013).

Accordingly, I will deny a motion to dismiss where the
Complaint contains factual allegations with "enough heft to show
that plaintiff is entitled to relief," *Ruiz Rivera* v. *Pfizer
Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (internal
quotations and alterations omitted), in the sense that the
allegations provide "enough to raise a right to relief above the

10

speculative level." *Hamilton* v. *Partners Healthcare System, Inc.*, 209 F. Supp. 3d 397, 404 (D. Mass. 2016) (citing *Twombly*, 550 U.S. at 555).

As a procedural matter, Plaintiffs may not seek judicial relief under ERISA until they have exhausted their available administrative remedies. *See LaRue* v. *DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 258-59 (2008). There is no dispute here that Dr. McCoy satisfied this requirement by filing her claim and appealing her denial of that claim through the processes outlined by the Plan.

### III. ANALYSIS

**A.    *The Purpose of ERISA***

The Supreme Court has observed that "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). ERISA imposes certain requirements on plans, such as "various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility . . . ." *Id.* at 91.

**B.    *Consideration of Plan Document***

Ordinarily, a court may not properly consider documents beyond the complaint during motion to dismiss practice. *See Alternative Energy, Inc.* v. *St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

There is, however, "a narrow exception for documents the authenticity of which are not disputed by the parties; . . . for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (quoting *Beddall* v. *State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).  I may properly consider these documents, when sufficiently relied upon in the Complaint, without converting the motion to dismiss into a motion for summary judgment. Documents so essential to plaintiffs' claims can be understood to "merge[] into the pleadings." *Alternative Energy, Inc.*, 267 F.3d at 34 (quoting *Beddall*, 137 F.3d at 17).  In the First Circuit, "when a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), then the court can review it upon a motion to dismiss." *Beddall*, 137 F.3d at 17; *see also Álvarez-Maurás* v. *Banco Popular of Puerto Rico*, 919 F.3d 617, 622-23 (1st Cir. 2019).

Although Plaintiffs assert they have not received the Plan documents, the relief they seek is governed by the Plan and is dependent upon its language.  Thus, their Complaint is necessarily linked to the Plan.  I will therefore consider the Plan document, as attached to Raytheon's motion to dismiss. *Accord Garcia-Tatupu v. Bert Bell/Peter Rozelle NFL Player Retirement Plan*, 296 F. Supp. 3d 407, 410 (D. Mass. 2017)

(dismissing the plaintiff's claim when motion practice added to the record the Marital Separation Agreement which was central to the claim.  The absence of this document during the initial consideration of the motion to dismiss practice had rendered the analysis "impossible"), *aff'd* 747 F. App'x 873 (1st Cir. 2019).

## C.    *The Estate of Mr. Smith as formally a Proper Party in Interest*

The Defendant has sought to dismiss the Estate of Mr. Smith as a party to this litigation because its presence raises the prospect of double recovery.  Although Mr. Smith's Estate seeks no unique relief, its presence as a party in this case can reasonably be understood to be representing the interest of Mr. Smith in the retirement plan benefit that he was foreclosed from formally electing.  This understanding is confirmed in Plaintiffs' opposition to the motion to dismiss.  *See* Dkt No. 15 at 2, n. 1.  Nothing in the Complaint suggests that Dr. McCoy and Mr. Smith's Estate are each seeking independent recovery.  I would not, in any event, make a duplicative award.  Plaintiffs, in fact, have expressly clarified in their Brief in Opposition to the Defendants' motion that they do not seek a double recovery.  Consequently, Mr. Smith's Estate will not be dismissed as a party in this case, although its presence seems redundant since its interest in the relevant legal questions is identical to that of Dr. McCoy.

**D.**   ***The Plaintiffs' Claims for Relief***

   1.   Count I: Claim for Denial of Benefits, to Enforce
        Rights and Clarify Rights under ERISA § 502(a)(1)(B)

   *a.*   *Reliance on the Unambiguous Plan Language*

   The basic framework created by ERISA relies upon the text of the plan at issue.  *See US Airways, Inc.* v. *McCutchen*, 569 U.S. 88, 101 (2013) ("The plan, in short, is at the center of ERISA"); *see also*, *Heimeshoff* v. *Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 109 (2013) (internal quotations and citations omitted) (the "rights and duties" under ERISA are "built around reliance on the face of written plan documents").  The statutory text authorizes participants "to recover benefits due to [them] *under the terms of [their] plan[s]*, to enforce [their] rights *under the terms of the plan*, or to clarify [their] rights to future benefits *under the terms of the plan*."  *Id.* at 108 (emphasis added by Supreme Court in citing ERISA § 502(a)(1)(B)).

   Courts analyze the terms of ERISA plans just as they do those in other contracts, "by looking to the terms of the plan and other manifestations of the parties' intent." *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 113 (1989).  The unambiguous provisions of the Plan dictate that Mr. Smith would, at a minimum, have had to submit his election of a non-standard retirement annuity prior to his death for Dr. McCoy to be

eligible for the relief sought by this lawsuit.  I now turn to the alleged facts to determine, in the light most favorable to the Plaintiffs, whether their pleading justifies limiting Dr. McCoy to the default annuity plan.

### b.    *Mr. Smith Never Formally Retired But that is Irrelevant*

Raytheon contends that Mr. Smith was required to retire to elect a non-standard annuity option.  Not so.  While the Complaint does not allege that Mr. Smith formally retired within the meaning of the Plan, that circumstance does not bar relief.

From the Complaint, I find the following: 1) Dr. McCoy called the Benefits Center "to assist her husband in retiring." This shows only a future intent to retire at the time she made the call; it does not establish that she, in fact, effectuated his retirement; 2) Dr. McCoy requested the summary materials for the annuity options, from which it can be inferred that this request was accompanied by some kind of communication, direct or indirect, regarding Mr. Smith's general intention to retire; 3) Mr. Smith evaluated the options and chose the 100% Joint and Survivor Annuity plan, but when Dr. McCoy called the Benefits Center to inform them of his choice, they refused to speak with her without (again) receiving his verbal consent; 4) the Benefits Center received the Power of Attorney on October 24, 2017; 5) Dr. McCoy expressed her concern about Mr. Smith's

inability to make his retirement *election* if the Power of
Attorney was not processed quickly; and 6) Dr. McCoy was
informed that Mr. Smith could make his retirement elections by
phone if he could verbally consent to her speaking for him or
speak himself.  From these allegations, it appears Mr. Smith
made Raytheon aware of his *intention* to retire but never
actually terminated his employment with the formal act of
retirement.

In any event, and more fundamentally, the Plan does not
appear to require formal termination of employment to elect
something other than the standard form of benefit.  Two Plan
provisions, Articles 8.5-A(a) and 9.2-A(a), plainly contemplate
a participant's pre-retirement selection of non-standard
annuity.

Article 8.5-A(a) provides "if a Participant retires and
elects an optional form of benefit under Section [Article] 9.2-A
(without regard to whether such election was made within the 180
day period ending on the Annuity Starting Date) . . . the
Surviving Spouse Benefit shall be calculated in accordance with
such prior election."  Article 9.2-A(a) states a participant may
elect to receive "a reduced Benefit payable during his lifetime
after retirement with payments of the same amount or of a lesser
amount to continue after his death to a Joint Annuitant
designated by the Participant . . . ."  This provision requires

only that a Participant elect a non-standard benefit "at any time within the period specified in Section [Article] 7.3-A." Article 7.3-A[12] does not explicitly require (or even mention) retirement.  Rather it lays out the "in writing" requirement for non-standard elections and that such an election must be made "within the 180-day period immediately prior to the Annuity Staring Date."

Under any fair reading, someone making a non-standard election before retiring does so to ensure proper payments begin once he or she actually retires.  I do not read the reference to "if" a Participant retires in Article 8.5-A(a) to impose a retirement requirement as a condition precedent under the terms of the Plan.

Here, Dr. McCoy first contacted the Benefits Center on October 9, 2017 and Mr. Smith died 18 days later, on October 27, 2017.  This is well within the 180-day window during which Mr. Smith could have changed his benefits election without formally

---

[12] Article 7.3-A provides

Each Participant may elect not to take the standard form of benefit to which the Participant is entitled as described in Section [Article] 7.1-A by filing a written election to such effect *prior to the Annuity Starting Date* on a form provided by the Administrator.  This election *must be made within the 180-day period immediately prior to the Annuity Starting Date*.  The election not to take the standard form of benefit must specify the particular form of benefit under which the Benefit will be paid.

(emphasis added).

retiring.  Accordingly, I conclude based on the Plan documents submitted by Raytheon, that Mr. Smith's retirement was not a requirement for a non-standard annuity election.

> c.  *Mr. Smith did not, because he could not, formally elect his specific Annuity to Defendants' satisfaction before his Death*

Reserving, at this point, discussion of Raytheon's role in Mr. Smith's inability to elect his non-standard annuity in a timely fashion before his death, there is no dispute that his election never formally occurred.  After Mr. Smith reviewed his options, he indicated that he wanted the 100% Joint and Survivor Annuity.  When Dr. McCoy called to inform the Benefits Center of her husband's choice, they would not accept his election from her.  The next day, Dr. McCoy faxed the Power of Attorney, but when she called again the day after, the Benefits Center informed her, contrary to the Plan language,[13] that Mr. Smith could make his elections by phone.  Meanwhile, the Benefits Center persisted in its refusal to speak with her until it had processed the Power of Attorney.  Over her objections, the Benefits Center maintained that position.  Mr. Smith died two days later, which was more than two weeks before the Power of Attorney was eventually processed.

---

[13] *See supra* n. 12 Article 7.3-A of the Plan: "Each Participant may elect not to take the standard form of benefit to which the Participant is entitled as described in Section [Article] 7.1-A by filing a written election to such effect . . . ."

While Plaintiffs are technically correct that the Plan does not explicitly require that the Participant be alive to make his or her election, it does not appear that this nuance has any legal import for purposes of Count I.  Because the Power of Attorney was processed by Raytheon after Mr. Smith's death, it no longer functioned as a mechanism by which Dr. McCoy could act for him.  Therefore, she could not have made a different election on his behalf, even if that election was still before the Annuity Starting Date.[14]  In any event, it is not clear from the Complaint when the Annuity Starting Date would actually have been.

From this, I am left with one question that will be dispositive as to Count I:  What, if any, legal import is to be assigned as to that Count regarding Raytheon's actions in allegedly frustrating Mr. Smith's attempts to make a non-standard retirement election prior to his death?

> d.   *Raytheon's Role in Causing Mr. Smith Not to Retire or Elect his Annuity Plan before his Death*

It is clear both that the Plan language is central to eligibility questions and that Mr. Smith did not technically meet the "in writing" requirement set forth in the Plan.[15]

---

[14] The Power of Attorney states "[t]his Power of Attorney is to continue in full force and effect *during my lifetime*. . . ." (emphasis added).

[15] I note that "ERISA plans must be in writing and cannot be modified orally."  *Livick* v. *The Gillette Co.*, 524 F.3d 24, 31

What remains is whether (1) Raytheon's oral provision of misinformation regarding the Plan requirements or (2) Raytheon's refusing/failing to recognize a valid Power of Attorney within two days,[16] insofar as these actions frustrated Mr. Smith's making a non-standard retirement election prior to his death, can overcome his non-compliance with the Plan language and allow for Plaintiffs' relief under ERISA.

Plaintiffs cite no legal authority for their position that the role Raytheon allegedly played in preventing Mr. Smith from electing benefits in compliance with the Plan requirements allows Plaintiffs to seek relief under § 502(a)(1)(B). Claims under this sub-section of ERISA are necessarily tethered to the language of the Plan, which Plaintiffs concede Mr. Smith did not satisfy by its terms.

However, Congress anticipated situations where the specifically applicable provisions may fail to encompass the broader purposes for which ERISA was passed, namely to protect

_____

(1st Cir. 2008). This is effectively dispositive as to Count I, the § 502(a)(1)(B) claim, but not, as will appear below, for the equitable claim asserted in Count III under § 502(a)(3).
[16] I note the Benefits Center had previously received Mr. Smith's verbal consent to speak with Dr. McCoy on his behalf. They requested and obtained it during the October 9, 2017 phone call. This raises the question whether Plaintiffs could claim that the consent should have persisted and the Benefits Center's subsequent refusal to speak with Dr. McCoy was improper. If that initial verbal consent had allowed Dr. McCoy to speak with the Benefits Center on Dr. Smith's behalf later, then the delay could have been avoided.

employees and their beneficiaries.  Accordingly, while I must grant Raytheon's motion to dismiss with respect to Count I for failure to state a claim, I do so while also observing that the facts alleged in the Complaint are properly pled to support a claim under the "catchall," *see Varity Corp.* v. *Howe*, 516 U.S. 489, 511 (1996), provision in § 502(a)(3), as alleged in Count III discussed more fully in Section III.D.3 *infra*.

> 2.   Count II: Claim for Breach of Fiduciary Duty under ERISA §§§ 404, 409, and 502(a)(2)

Claims brought pursuant to ERISA § 502(a)(2), which authorizes relief under ERISA § 409(a), may only be brought on behalf of plans, as "Congress did not intend [§ 409] to authorize any relief except for the plan itself."  *Mass. Mut. Life Ins. Co.* v. *Russell*, 473 U.S. 134, 140, 144 (1985) (finding "recovery for a violation of § 409 inures to the benefit of the plan as a whole," as "this contention [is] supported by the text of § 409, by the statutory provisions defining the duties of a fiduciary, and by the provisions defining the rights of a beneficiary").  As *Russell* emphasizes, the relevant text provides for recovery "to make good *to such plan* any losses *to the plan* . . . and to restore *to such plan* any profits of such fiduciary which have been made through use of assets *of the plan* . . ."  *Id.* at 140 (emphasis in original) (quoting ERISA § 409(a)); *see also id.* (also citing the Committee Reports'

emphasis on losses *to the plan* at H.R. Conf. Rep. No. 93-1280, p. 320 (1974)); *accord LaRue* v. *DeWolff, Boberg, & Assocs., Inc.*, 552 U.S. 248, 256 (2008) ("[Section] 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries.").[17]

Plaintiffs have not made allegations of loss to the Plan nor do they plead any facts by which I could infer such a loss; Count II fails as a matter of law.  Consequently, I will grant Raytheon's motion to dismiss with respect to Count II.

### 3.   Count III: Claim for Equitable Relief under ERISA § 502(a)(3)

In light of my dismissal of Counts I and II, I turn to whether Plaintiffs adequately plead Count III as a sole remaining basis for relief.[18]

-----

[17] There is an exception in this area, which relates to defined contribution plans.  Broadly stated, this exception allows for an individual participant to seek relief for the loss of value of his or her individual plan account.  The Plan in this case, however, is a defined benefit plan that pays out according to a formula, rather than on the basis of the value of the assets in the pension account.  Accordingly, this defined contribution exception is not applicable to Plaintiffs' claims. *See LaRue* v. *DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) ("[Section] 502(a)(2) . . .  does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account."); *see also Evans* v. *Akers*, 534 F.3d 65, 71 n.5 (1st Cir. 2008) (citing *LaRue* to distinguish defined contribution plans, for which an individual participant may seek relief under ERISA § 502(a)(2), from defined benefit plans).

[18] The Plaintiffs are entitled to seek relief under § 502(a)(3) specifically because they have no remedy under § 502(a)(1)(b); there is no danger that equitable relief will be duplicative.

Section 502(a)(3) provides for the kind of relief
"*typically* available in equity" prior to the merger of law and
equity. *See Mertens* v. *Hewitt Associates*, 508 U.S. 248, 256
(1993).  For Count III, Plaintiffs must make out an adequate
claim of a breach of Raytheon's fiduciary duty under the
circumstances and a theory for recovery through either equitable
estoppel or surcharge/disgorgement, or both.  *See generally*,
*CIGNA Corp.* v. *Amara*, 563 U.S. 421, 443-44 (2011) (discussing
estoppel and surcharge as appropriate forms of equitable relief
for named plaintiff under § 502(a)(3)).

---

As Judge Casper explained in *Trovato* v. *Prudential Ins. Co. of
Am.*, the First Circuit has not yet spoken to whether a plaintiff
may initially bring claims for relief under both § 502(a)(1)(b)
and § 502(a)(3), so long as he or she does not ultimately
recover under both claims.  No. 17-CV-11428-DJC, 2018 WL 813368,
at *3 (ECF No. 39) (D. Mass. Feb. 9, 2018).  Like Judge Casper,
I am persuaded by the approach adopted in the Second, Eighth,
and Ninth Circuits and will not dismiss Plaintiffs' claims under
502(a)(3) simply because they brought an alternative claim which
will be dismissed on other grounds.  *Id.* (citing *Moyle v.
Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 961 (9th Cir. 2016),
*as amended on denial of reh'g and reh'g en banc* (Aug. 18, 2016);
*N.Y. State Psychiatric Ass'n*, v. *UnitedHealth Grp.*, 798
F.3d 125, 134 (2d Cir. 2015), *cert. denied sub nom. UnitedHealth
Grp., Inc.* v. *Denbo*, 136 S. Ct. 506 (2015); *Silva* v. *Metro. Life
Ins. Co.*, 762 F.3d 711, 726 (8th Cir. 2014).).  This is the
approach also followed by my colleagues Judge Burroughs in *Brent
S.* v. *Blue Cross Blue Shield of Massachusetts, Inc.*, No. 17-CV-
11569-ADB, 2019 WL 3253357, at **3-4 (ECF No. 74) (D. Mass. July
19, 2019) (finding "the approach espoused in *Trovato* to be both
practical and equitable and [adopting] the same . . . .") and by
Judge Talwani in *Conformis, Inc. v. Aetna, Inc.*, No. 1:20-CV-
10890-IT, 2021 WL 1210293, at *6 (ECF No. 48) (D. Mass. Mar. 31,
2021)(adopting the approach stated in *Trovato*).

a.   *Raytheon Assumed a Fiduciary Role*

Raytheon argues that the Complaint fails to make out the factual allegations necessary to a claim of breach of fiduciary duties, specifically that the Benefits Center acted as a fiduciary when committing allegedly culpable conduct.

As an initial matter, John Doe, the yet unnamed Plan Administrator is plainly a fiduciary, as outlined in the Plan document.  *See supra* n. 9 and accompanying text.  Moreover, the Plan Administrator can properly delegate his or her responsibilities under the Plan.  *See supra* n. 10.  Therefore, without additional information to the contrary, I can reasonably infer that the Plan Administrator can be held responsible for actions of other named defendants and the Benefits Center if he or she delegated authority to them.

Even without these explicit provisions lending themselves to an inference favorable to Plaintiffs' position, however, there are other factors to consider when making a determination regarding fiduciary responsibilities.

Fiduciary duties "draw much of their content from the common law of trusts" in the ERISA context.  *Varity Corp.*, 516 U.S. at 496.  Nevertheless, "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection."  *Id.* at 497.  When interpreting the extent and

nature of fiduciary duties in the ERISA context, "Congress expect[ed] that the courts [would] interpret [a] rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefit plans, as they develop a federal common law of rights and obligations under ERISA-regulated plans." *Id.* (internal quotations and other citations omitted). Courts must "take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, . . . and . . . its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place," which may include looking beyond the law of trusts. *Id.* (comparing ERISA § 2, 29 U.S.C. § 1001(b), with *Curtis-Wright Corp.* v. *Schoonejongen*, 514 U.S. 73, 78-81 (1995) and *Mertens*, 508 U.S. at 262-63)).  The law of trusts will therefore "inform, but will not necessarily determine the outcome of, an effort to interpret ERISA fiduciary duties." *Id.*

First Circuit case law has held that, "under ERISA, a fiduciary is defined functionally: a party is a fiduciary to the extent that he or she exercises discretion over the management of the plan or its funds or over its administration." *Livick* v. *The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) (internal citations and quotations omitted); *see also Barchock* v. *CVS*

*Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)) ("ERISA provides that any person who exercises discretionary authority or control in the management or administration of an ERISA plan. . . is a fiduciary.").

On the other hand, purely ministerial tasks, such as preparation of reports, interpretation of policies made by others, and determination of benefit amounts due under a Plan are non-fiduciary functions. *Livick*, 524 F.3d at 29.

ERISA liability "for plan-related misdeeds [is allocated] in reasonable proportion to respective actors' power to control and prevent the misdeeds." *Mertens*, 508 U.S. at 262 (observing also that, in trust law, only the trustee had fiduciary duties, while "ERISA, . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan… thus expanding the universe of persons subject to fiduciary duties – and to damages . . ." and "assuming nonfiduciaries can be sued under § 502(a)(3)").[19]   Some courts

---

[19] Leaving aside the explicit allocation of fiduciary responsibility to the Plan Administrator, and his or her ability to delegate, it appears that at least some of the alleged actions by Raytheon facially constituted those of fiduciaries. This issue, however, cannot be resolved definitively at this stage.  Further factual discovery or stipulations of the parties will make the answer to that specific inquiry clearer.

I reserve the question for now because liability under § 502(a)(3) may not always require that the defendant be a fiduciary in the first instance.  *Cf. Harris Trust and Sav. Bank* v. *Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (Section 502(a)(3)'s authorization of a "'participant, beneficiary, or

have even held named fiduciaries liable "when non-fiduciary
representatives provided beneficiaries with misleading
information, . . . where the fiduciaries failed to provide clear
and accurate information in the first place." *See Livick*, 524
F.3d at 30 (citing *Bowerman* v. *Wal-Mart Stores, Inc.*, 226 F.3d
574, 591 (7th Cir. 2000) for the proposition that fiduciaries
have been held liable for the provision of inaccurate
information by a non-fiduciary agent when a participant cannot

---

fiduciary' of a plan to bring a civil action to obtain
'appropriate equitable relief'. . . extends to a suit against a
nonfiduciary 'party in interest'" to a prohibited transaction
under ERISA).  This remedial, "*catchall*" provision of ERISA, *see*
*supra Varity Corp.*, 516 U.S. at 511, "itself imposes certain
duties, and therefore . . . liability under that provision does
not depend on whether ERISA's substantive provisions impose a
specific duty on the party being sued," such that ERISA "does
authorize a civil action against a nonfiduciary" in this
context. *Harris Trust*, 530 U.S. at 244-45.  In *Harris Trust*,
the nonfiduciary party was a third-party broker-dealer who
engaged in a prohibited transaction under ERISA § 406(a), which
prohibits a "fiduciary of an employee benefit plan from causing
the plan to engage in certain transactions with a 'party in
interest'" were permissible. *Id.* at 243.

  Although the circumstances of this case are obviously
distinguishable because the underlying conduct here does not
relate to a prohibited transaction with a party in interest, the
rationale underlying the Supreme Court's decision in *Harris*
*Trust* nevertheless applies.  The Supreme Court held that the
language of § 502(a)(3) is clear to the degree it does not bar
parties from seeking relief from nonfiduciaries.  Indeed, the
court concluded § 502(a)(3) imposes duties, itself, to redress
violations of ERISA.  *Id.*  Protection from prohibited
transactions is but one of many protections provided by ERISA
for plan participants.  Even if Raytheon, or named defendants
other than the Plan Administrator, were not acting as
fiduciaries, § 502(a)(3) may still be a vehicle by which
Plaintiffs can obtain relief.  If necessary, I will revisit this
question after the parties have engaged in discovery.

verify the misleading information); *see also Schmidt v. Sheet Metal Workers' Nat. Pension Fund*, 128 F.3d 541, 548 (7th Cir. 1997) (emphasis added) (fiduciaries not held liable for material misstatement by nonfiduciary *because* they "provided complete and accurate information in the Plan and Plan Booklet they distributed to participants," *but* "[i]f the written materials were inadequate, then the fiduciaries themselves must be held responsible for the failure to provide complete and correct material information in the event that a nonfiduciary agent provides misleading information").

At this stage, I take the facts alleged in the light most favorable to the non-moving parties.  The Plan Administrator had explicit fiduciary duties under the unambiguous Plan language. A reasonable factfinder could conclude that at least one of the actions alleged to have been undertaken by Raytheon was more than purely administrative or ministerial.  It appears the Benefits Center exercised functional authority over Mr. Smith's access to benefits, such that Raytheon had a fiduciary duty in that respect.  At the motion to dismiss stage, this is sufficient for Plaintiffs to overcome the issue of Raytheon's serving a fiduciary function.

I turn now to identify what I see as the three specific categories of alleged actions by the Benefits Center at the center of Plaintiffs' case that could relate to breaches of

fiduciary duties.

       i.    Processing and Approval of the Power of
            Attorney

Whether an actor is a fiduciary turns on its exercise of discretion and functional control over the Plan.  When Dr. McCoy spoke with the Benefits Center on October 25, 2017, she had provided, and the Benefits Center had received, the duly executed Power of Attorney.  During the conversation, she informed the Benefits Center that time was of the essence.  Her husband was unlikely to survive the typical four to five days of processing time, which would have the consequence of foreclosing his ability to make his desired annuity election.  If the Benefits Center was a purely administrative body performing a ministerial task (i.e., inputting the Power of Attorney without further review) I find it unlikely that Mr. Smith's Power of Attorney could not have been approved more expeditiously under these circumstances.

The representative could have processed the Power of Attorney with Dr. McCoy on the phone if discretion as to the contents of the document was not required.  In that case, the Power of Attorney would have been processed and the annuity election could have been submitted prior to Mr. Smith's death.  According to Raytheon's own briefing, the Power of Attorney was "a complicated 12-page, single-spaced legal document" that would

take "more than two days to process and approve" because Powers
of Attorney submitted by Plan participants and beneficiaries "do
not come in any set format, and must be reviewed to determine
what powers they grant . . . when they become effective, what
limitations and conditions they impose, and whether they satisfy
the formal requirements . . . , which vary from state to state."
Dkt. No. 14 at 16.  This kind of purported extensive *ex ante*
review function, which in fact took more than twice as long as
the promised four to five days, suggests exercise of discretion
and control over administration of Plan benefits, rather than
ministerial paper-processing. *Cf. Guerra-Delgado* v. *Popular,
Inc.*, No. 11-1535-JAF, 2012 WL 1069703, at *4 (ECF No. 52)
(D.P.R. Mar. 29, 2012) *aff'd* 774 F.3d 776, 783 (1st Cir. 2014)
(giving "misleading information to Plaintiff regarding the
security of his future benefits [on company letterhead], at a
time when he might have chosen to pursue other employment
opportunities[]" was not merely ministerial action).

> ii.  Barring Mr. Smith from Making Elections by
>      Phone

The next category of conduct is Plaintiffs' allegation that
a Benefits Center representative told Dr. McCoy Mr. Smith could
make his retirement elections over the phone.  The facts
required to make a determination on this issue have not yet been
completely developed in the Complaint.  I must make inferences

in the light most favorable to the non-moving parties to fill the information gaps.

To be sure, "ERISA plans must be in writing and cannot be modified orally." *Livick*, 524 F.3d at 31; *Law* v. *Ernst & Young*, 956 F.2d 364, 370 & n.9 (1st Cir. 1992). Although Plaintiffs assert that they do not have the Plan document,[20] it is well-

---

[20] Specifically, the Plaintiffs contend "the actual terms of the Plan were known only to Defendants." *See also, CIGNA Corp.* v. *Amara*, 563 U.S. 421, 443 (2011) (citing ERISA § 102(a)) ("The relevant substantive provisions of ERISA do not set forth any particular standard for determining harm.  They simply require the plan administrator to write and to distribute written notices that are 'sufficiently accurate and comprehensive to reasonably apprise' plan participants and beneficiaries of 'their rights and obligations under the plan.'").

Under certain circumstances, a failure to inform beneficiaries of material facts about the plan can constitute a breach of fiduciary duty. *See Watson* v. *Deaconess Waltham Hosp.*, 298 F.3d 102, 114-115 (1st Cir. 2002).  The First Circuit has outlined two limitations to this duty: "First, a duty only arises if there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful." *Id.* (collecting cases where duty arose).  Regarding the scope of circumstances in which this duty applies, the First Circuit adopted the reasoning of the Fourth Circuit in *Griggs* v. *E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 380-81 (4th Cir. 2001): "An ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent" *Watson*, 298 F.3d at 115 (quoting *Griggs*).  "Second, fiduciaries need not generally provide individualized *unsolicited* advice." *Watson*, 298 F.3d at 115 (emphasis added).

The First Circuit has also referenced favorably the Third Circuit's decision in *Jordan* v. *Federal Exp. Corp.*, 116 F.3d 1005, 1014-17 (3d Cir. 1997), where the court found that the employer's failure to provide the employee with an official Summary Plan Description or otherwise inform him that his elections were nonrevocable after retirement breached its fiduciary duty even though the employee never inquired about revocability.  *Watson*, 298 F.3d at 116 (discussing *Jordan*).  In

established that "an informal statement in conflict with [the plan] is in effect purporting to *modify* the plan term, [thereby] rendering any reliance on it inherently unreasonable." *Livick*, 524 F. 3d at 31.  On the other hand, a beneficiary might reasonably rely on an informal statement interpreting "an *ambiguous* plan provision." *Id.*

The Plan clearly requires that non-standard annuity elections, such as the 100% Joint and Survivor Annuity, be submitted in writing.  Article 7.3-A provides that "[e]ach Participant may elect not to take the standard form of benefit to which the Participant is entitled as described in Section [Article] 7.1-A *by filing a written election to such effect.*" (emphasis added).  Accordingly, in the usual course, an informal representation from the Benefits Center that Mr. Smith could

---

*Jordan*, the employee had been provided with some information about the plan; however, none of it touched on the issue of revocability and was, therefore, misleading in such a way that amounted to a breach of fiduciary duty in this context.  *Id.*

  Here, Dr. McCoy explicitly and repeatedly sought instruction regarding how to execute her dying husband's annuity selection. Moreover, it is not, as yet, clear whether the summary documents received by Plaintiffs included guidance that contradicted the misinformation they received orally.  With these alleged facts and information gaps that I must resolve in Plaintiffs' favor, it is reasonable for me to infer that Raytheon was aware that, given the (mis)information with which Dr. McCoy was operating in the final days of her husband's life, Raytheon's failure to correct her misunderstanding (for which they provided the basis) would have materially adverse consequences for her and Mr. Smith.

make such a non-standard election by phone could not reasonably
be relied upon, and there could be no breach of fiduciary duty
by Raytheon if a plan participant sought to do so.

There is, however, an exception for the provision of
misleading information (even by nonfiduciaries) to participants
or beneficiaries when they have no means by which to verify the
information or when the fiduciaries failed to provide accurate
information.  *See supra Bowerman*, 226 F.3d at 591; *see also*,
*Schmidt*, 128 F.3d at 548.

Without being able to determine from the Complaint whether
the fiduciaries responsible for providing the Benefits Center
with information regarding the Center's exercise of
discretionary authority did so adequately, or whether Plaintiffs
ever received the Plan document they claim never to have seen,[21]
I am left to decide whether I can infer a plausible scenario
regarding this category in Plaintiffs' favor.  I believe I can.
From the Plaintiffs' Complaint, it could plausibly be inferred
that Mr. Smith and Dr. McCoy never received the Plan documents,

---

[21] The Complaint makes clear that Plaintiffs did receive
materials that summarized the annuity options available to Mr.
Smith, but it is not clear whether instructions regarding proper
election were part of those materials. *See* Complaint at ¶¶ 25-
26. In any event, even if these summary documents did include
some information regarding election, "summary [plan] documents,
important as they are, provide communication with beneficiaries
*about* the plan, but [ ] their statements do not themselves
constitute the terms of the plan . . . ."  *Amara* 563 U.S. at
438.

and Raytheon bears responsibility for not providing those documents or properly training the Benefits Center to communicate the terms of the Plan correctly.  In such circumstances, Raytheon could be held responsible for a breach of fiduciary duty, even though the misinformation was directly contradicted by the Plan language.

>        iii. Failing to Advise Mr. Smith Regarding
>             Necessary Steps for Election of his
>             Preferred Annuity and Retirement

This third category of alleged breach of Raytheon's fiduciary duty is very similar to the second in that it is based on the Benefits Center's failure fully and accurately to advise Mr. Smith and Dr. McCoy of the necessary steps to effectuate his retirement and benefits election.  The same information required to make a determination with regard to the second category applies to this category as well.  Without knowing whether Plaintiffs had another means by which to learn the required steps for Mr. Smith to retire and elect his annuity plan and whose responsibility it was to inform participants and beneficiaries, there is a reasonable inference that Raytheon bore this responsibility and can therefore be found to have breached its fiduciary duty in this respect.

**E.   Elements of a Claim under § 502(a)(3)**

The dispositive question before me in evaluating the Plaintiffs' pleading of Count III is whether, assuming *arguendo*

that Raytheon breached a fiduciary duty it owed to Plaintiffs, Plaintiffs adequately plead the elements of a § 502(a)(3) claim. The form of equitable relief generally granted under this provision of ERISA typically falls into the following two categories, generally described as: (1) Estoppel and (2) Disgorgement or Surcharge. *See generally Amara*, 563 U.S. at 443-44.

I find that Plaintiffs did not adequately plead an estoppel claim, but that they do have a viable claim for disgorgement or surcharge. For purposes of providing equitable relief, the Supreme Court has held the importance of the foundational principle of "strip[ping] wrongdoers of their ill-gotten gains" outweighs concerns about which of the various labels to apply to a particular form of relief. *See Liu* v. *SEC*, 140 S. Ct. 1936, 1942-43 (2020) (quoting *Root* v. *Railway Co.*, 105 U.S. 189, 207 (1882) ("No matter the label, . . . '[i]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong.'")).

1.  Estoppel

An equitable estoppel claim has two elements: "(1) the first party must make a definite misrepresentation of fact with reason to believe the second party will rely on it, and (2) the second party must reasonably rely on that representation to its

35

detriment." *Guerra-Delgado* v. *Popular, Inc.*, 774 F.3d at 783
(internal citations and quotations omitted).

While most circuits have recognized estoppel claims under §
502(a)(3), *see Livick*, 524 F. 3d at 30-31 (listing cases), the
First Circuit has not yet had occasion to consider whether an
estoppel claim is a proper vehicle under ERISA's civil
enforcement provision. *See Guerra-Delgado* 774 F.3d at 782.
Based solely on the facts alleged in the Complaint, this does
not appear to be a case to offer a resolution of that issue.[22]

While Plaintiffs have alleged both a misrepresentation
through the Benefits Center's claim that Mr. Smith could make
his elections over the phone and enough for a reasonable
inference that the Benefit Center's representative could have
reasonably believed that Dr. McCoy would rely on it, they have
failed to plead actual reliance to their detriment adequately.

The Complaint contains thin allegations related to the
October 25, 2017 conversation in which the Benefits Center told
Dr. McCoy that Mr. Smith could make his elections over the

---

[22] Nevertheless, I note that I share the view expressed by Judge
Saylor that claims grounded in equitable estoppel in this
context should not be dismissed solely on the basis that the
First Circuit has not yet formally recognized this as a proper
cause of action. *See Hoffman* v. *Textron*, No. 17-cv-11849-FDS,
2018 WL 3352963, at *4 (ECF No. 31) (D. Mass. July 9, 2018) ("In
light of the apparent consensus among circuit courts that an
equitable estoppel claim under ERISA § 502(a)(3) is viable, the
Court will not dismiss the claim on that basis").

phone; however, there is enough to determine that there was no detrimental reliance on that misrepresentation.  During that phone call, Mr. Smith could no longer speak, and "the [Benefits Center] would not allow Dr. McCoy to make those elections on his behalf even though Defendants were in possession of the POA authorizing Dr. McCoy to do so."  Nowhere in the Complaint do Plaintiffs suggest that, despite having the conversation cut off at this juncture, they relied on the Benefits Center's statement to believe they had, in fact, made his elections that day, and there is no available inference to that effect.  In fact, the Complaint suggests that they *did* know the elections had not been perfected.  As the complaint alleges "[t]he only reason that such elections were *not made*, and processed by Defendants, prior to Mr. Smith's death was the Defendants' delay in processing the POA and in *not allowing* Mr. Smith's attorney-in-fact to act in accordance with the POA."  *Id.* at ¶ 30 (emphasis added).  Consequently, I find Plaintiffs have failed to plead facts adequately to support an equitable estoppel theory of relief under § 502(a)(3).[23]

---

[23] I note as a general matter, however, that detrimental reliance is not a requirement for all equitable relief. *See Amara*, 563 U.S. at 444 (internal citations and quotations omitted) (equity courts "simply ordered a trust or beneficiary made whole following a trustee's breach of trust.  In such instances equity courts would mold the relief to protect the rights of the beneficiary according to the situation involved.").

## 2.   Disgorgement/Surcharge

Although equitable relief available pursuant to § 502(a)(3) does not include compensatory damages, there are circumstances under which disgorgement and/or surcharge may properly be considered equitable relief in the form of restitution.  *See LaRocca* v. *Borden, Inc.*, 276 F.3d at 22, 28 (1st Cir. 2002) (internal citation and quotation omitted)("Restitution is an equitable remedy providing a tool for courts to use when one party has been unjustly enriched at the expense of another").  Disgorgement concerns return of ill-gotten gains,[24] while surcharge is the remedy by which plaintiffs are made whole from an actual loss that resulted from a fiduciary's breach of duty.  Both seek to avoid unjust enrichment of the wrongdoer.  For present purposes, where discovery has not developed sufficient information to determine whether making Plaintiffs whole will require the disgorgement of ill-gotten gains, I focus my discussion on surcharge, rather than disgorgement.

In *Amara*, the Supreme Court acknowledged surcharge as an equitable remedy responsive to "a breach of trust committed by a fiduciary encompassing any violation of duty imposed on that

---

[24] *See, e.g.*, *Chauffeurs, Teamsters and Helpers, Local No. 391* v. *Terry*, 494 U.S. 558, 570 (1990) (internal quotations omitted) ("we have characterized damages as equitable where they are restitutionary, such as in action[s] for disgorgement of improper profits").

fiduciary," that allows courts "to provide monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Amara*, 563 U.S. at 441-442 (citing Restatement (Third) of Trusts § 95).

Disagreement as to the scope of *Amara*'s discussion of surcharge has arisen among courts across the country. Some have read the language to be expansive and therefore binding; some have reduced it to narrow dicta. As presciently anticipated by Magistrate Judge Collings, shortly after *Amara* was handed down, given "[t]he Supreme Court's broad language . . . vis a vis the relationship between an ERISA Plan and an ERISA Summary Plan Description . . . [Amara] is going to be a lightning rod for litigation in the future, especially as to how the holding will be applied to other parties of ERISA Plans and [Summary Plan Descriptions] which were not specifically at issue in the *Amara* case." *Merigan* v. *Liberty Life Assur. Co. of Boston,* 826 F. Supp. 2d 388, 397 (D. Mass. 2011) (footnote omitted). Aspects of the litigation debate are found in opinions by Judges in this District. *Compare, e.g.*, the opinions of Judge O'Toole and Magistrate Judge Kelley in *Brenner* v. *Metro Life Ins. Co.*, No. 11-12096-GAO, 2015 WL 1307394, at *5 n.2 (ECF No. 70) (D. Mass. Mar. 23, 2015) (citing the Fifth Circuit's adoption of guidance from *Amara*: "Even assuming it is dictum . . . we give serious consideration to this recent and detailed discussion of the law

by a majority of the Supreme Court") with the opinion of Judge
Casper in *Kenney* v. *State Street Corp.*, No. 09-cv-10750-DJC,
2011 WL 4344452, at *7 (ECF No. 156) (D. Mass. Sept. 15, 2011)
("Relying upon dictum in *Amara* that addressed the equitable
relief under § 502(a)(3), but left to the lower courts how to
determine whether such remedies would be appropriate on the
facts of the case . . .") and of Judge Young in *Moitoso* v. *FMR,
LLC*, 410 F. Supp. 3d 320, 328 (D. Mass. 2019) (applying guidance
regarding § 502(a)(3) as binding authority, and citing *Amara* to
demonstrate the "Supreme Court held that an 'award of make-whole
monetary relief' constituted an equitable surcharge . . . .").

 Although the Supreme Court remanded *Amara* for further
analysis as to the propriety of applying the "general
principles" they had outlined, its interpretation of the scope
of § 502(a)(3) goes beyond mere dicta.  While the First Circuit
has not had occasion to adopt the surcharge approach, as
Magistrate Judge Kelley observed "[t]hree other circuits . . .
have ruled since *Amara* [that] monetary damages are recoverable
under the theory of 'surcharge' when a fiduciary violates its
duty under § 502(a)(3)."  *Brenner*, 2015 WL 1307394, at *6 (D.
Mass. Mar. 23, 2015) (citing the Fourth, Fifth, and Seventh
Circuits).  And as Judge Casper held more recently in *Trovato* v.
*Prudential Ins. Co. of Am.*, No. 17-cv-11428-DJC, 2018 WL 813368,
at *2 (ECF No. 39) (D. Mass. Feb. 9, 2018) (citing *Amara*, 563

U.S. at 444) (Section 502(a)(3) "empowers a district court, in the context of suits by a beneficiary against a plan fiduciary, to impose remedies in accordance with the traditional equitable powers of the court . . . [which] may also include imposing a 'surcharge' to make a beneficiary 'whole following a trustee's breach of trust' which actually harmed the beneficiary.").

To obtain relief in the form of surcharge, Plaintiffs must show "that the violation injured [them].  But to do so, [they] need only show harm and causation." *Amara*, 563 U.S. at 444. Just as the definition of a fiduciary in the ERISA context is practical and functional, so too is the standard for harm in the context of equitable relief. *See id.* at 445 ("Information-related circumstances, violations, and injuries are potentially too various in nature to insist that harm must always meet that more vigorous 'detrimental harm' standard when equity imposed no such strict requirement.").

> a.   *Duty of Prudence Under the Circumstances*

Those who hold fiduciary positions have the "duty to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiarity with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Barchock*, 886 F.3d at 44 (citing 29 U.S.C. § 1104(a)(1)(B), ERISA § 404(a)(1)(B)).  Plaintiffs' claims

under § 502(a)(3) appear to rely on the fiduciaries' breaches of
the duty of prudence given the circumstances alleged in the
Complaint.  Under ERISA, the duty of prudence "turns on the
circumstances . . . prevailing at the time the fiduciary acts,"
and will therefore be "context specific."  *Fifth Third Bancorp*
v. *Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).

All three of the categories of actions alleged by the
Plaintiffs, discussed in Part III.D.3 *supra*, could reasonably be
characterized as a breach of the duty of prudence under the
circumstances.

As to the Power of Attorney, *see supra* Part III.D.3.a.i,
the Benefits Center was on notice that this was a time sensitive
request that would have devastating consequences if not dealt
with promptly.  Rather than move the Power of Attorney to the
front of the queue, the Benefits Center proceeded in the
"ordinary course" and then some, inordinately taking over two
weeks to process it.

With respect to the advice that Mr. Smith could make his
elections by phone, *see supra* Part III.D.3.a.ii, a Benefits
Center representative with knowledge of the Plan and exercising
ordinary diligence would not provide information directly
contrary to language in the Plan, itself.

Finally, to the degree Raytheon bears responsibility for
making Plan information available to participants and

beneficiaries, *see supra* Part III.D.3.a.iii, ordinary care and diligence would, at a minimum, require provision of the Plan materials or that representatives be able to advise participants and beneficiaries accurately of the necessary steps when they have no other source of information to ascertain the relevant requirements.

In short, it is a plausible inference from the Complaint that any one of the categories of actions by the Benefits Center, in this specific context, could constitute a breach of a fiduciary duty in the form of failure to exercise prudence under the circumstances.

> b.   Harm

Despite Raytheon's insistence to the contrary, the harm Plaintiffs suffered, and for which they seek equitable relief, is clearly alleged in the Complaint. Undoubtedly, additional fact discovery will produce a more precise figure to assign to the damage alleged, but the basis for the calculations is plainly laid out. Plaintiffs seek relief in the form of the difference between the 50% Joint and Survivor Annuity payout and the 100% Surviving Spouse Benefit payout,[25] the plan that Mr. Smith intended and attempted to elect prior to his death.

---

[25] Or 100% Joint and Survivor Annuity payout, if there is a material difference between the 100% Surviving Spouse Benefit and the 100% Joint and Survivor Annuity that Plaintiffs intend to pursue. *See supra* note 7.

Plaintiffs' prayer for relief comports with recent guidance from the Supreme Court that equitable relief not exceed wrongdoers' ill-gotten gains in such a way that inappropriately transforms the award to make plaintiffs whole into a penalty against defendants.  *See Liu*, 140 S. Ct. at 1942.

> c.  *Causation*

As a general proposition, "ERISA only allows for the recovery of loss 'resulting from' the fiduciary's breach . . . [which] means that a court need find causation before awarding damages."  *Brotherston* v. *Putnam Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018).

The First Circuit has adopted a burden-shifting approach regarding causation when loss to a plan has been properly alleged.  As directed by the Supreme Court, the First Circuit's approach to ERISA "regularly seeks . . . answer[s] in the common law of trusts." *Id.* at 36 (citing *Varity Corp.*, 516 U.S. at 496-97).  The First Circuit followed this approach and looked to the principles of trust law for the question of proving causation:

> The common law of trusts -- like ERISA -- classifies causation as an element of a claim for breach of fiduciary duty. *See* Restatement (Third) of Trusts, § 100 cmt. e. It also places the burden of disproving causation on the fiduciary once the beneficiary has established that there is a loss associated with the fiduciary's breach. Id. cmt. f. This burden allocation has long been the rule in trust law.

*Id.*

With the purposes of ERISA in mind, including that
"[t]he Supreme Court has made clear that whatever the
overall balance the common law might have struck between
the protection of beneficiaries and the protection of
fiduciaries, ERISA's adoption reflected 'Congress'[s]
desire to offer employees *enhanced* protection for their
benefits.'"  *Id.* (citing *Varity Corp.* 516 U.S. at 497)
(emphasis in *Brotherston*).  The First Circuit has
determined that once a breach and loss to a plan have been
shown, "the burden shifts to the fiduciary to prove that
such loss was not caused by its breach . . . ."  *Id.* at 39.

In this case, the loss alleged is to the Plaintiffs,
themselves, rather than the Plan; however, I find the
underlying rationale relied upon by the First Circuit in
adopting the burden-shifting approach applicable here as
well.  Just as it would "make[] little sense to have the
plaintiff hazard a guess as to what the fiduciary would
have done had it not breached its duty . . . only to be
told to 'guess again'" when participants and beneficiaries
question investment decisions, the same holds true when the
fiduciaries' decisions concern discretionary process
management and dissemination of correct (or incorrect)
information.  *See id.* at 38.

45

Both the breach and the harm have been adequately pled for motion to dismiss purposes.  Under the First Circuit's burden-shifting approach, as extended to losses to the Plaintiffs here, the burden shifts to Raytheon to produce evidence that the harm alleged by the Plaintiffs was not the result of any of the three categories of actions, which I have found have been plausibly alleged to constitute a breach of fiduciary duty.[26]

### IV.  CONCLUSION

For the foregoing reasons, Raytheon's Motion to Dismiss [Dkt. No. 13] is GRANTED as to Counts I and II and DENIED as to Count III.

The parties shall meet and confer for purposes of jointly preparing a status report and scheduling proposal to be submitted on or before December 6, 2021 with a view toward bringing this case to final judgment.  The case shall be set for

---

[26] Discovery may lead to the conclusion that some of the named Defendants were not fiduciaries and cannot be held liable for a breach of such a duty.  For those defendants, then, the question of causation will be moot.  However, taking the allegations in the light most favorable to Plaintiffs, I find there is a reasonable inference at this stage that, if there was a breach, that breach also caused the harm alleged in the Complaint, and could be attributable to any of the named Defendants.  Moreover, any damages that may be due Plaintiffs will be assessed so as only to hold each Defendant "liable to account for such [ill-gotten gains] . . . as have accrued to" that Defendant specifically.  *See Liu*, 140 S. Ct. at 1949 (internal citation and quotation omitted).

a zoom status/scheduling conference at 2:00 p.m. Wednesday,

December 22, 2021.




                              /s/ Douglas P. Woodlock
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE